**OSWALD & HESS CO. v. BOWLES, Price Administrator.**

**No. 49.**

United States Emergency Court of Appeals.

Heard at Chicago Oct. 26, 1944.

Decided March 29, 1945.

Writ of Certiorari Denied June 4, 1945.

See 65 S.Ct. 1411.

Eli E. Reich, of Pittsburgh, Pa. (Janavitz, Reich & Domesek, of Pittsburgh, Pa., on the brief), for complainant.

Jacob D. Hyman, Chief, Court Review Price Branch, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Carl H. Fulda, Atty., all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

Complainant Oswald and Hess Company describes itself as "a medium sized meat packing plant", engaged in "the general meat packing business" at Pittsburgh, Pa.

On August 20, 1942, complainant filed a protest under § 203 of the Emergency Price Control Act, 56 Stat. 23, 50 U.S.C.A.Appendix § 923, against Maximum Price Regulation No. 169—Beef and Veal Carcasses and Wholesale Cuts (7 F.R. 4653). After extended proceedings, the Administrator on May 4, 1943, issued an order denying the protest in so far as relief was not found in the provisions of Revised Maximum Price Regulation No. 169 which had been issued on December 10, 1942 (7 F.R. 10381).

Thereafter, on May 24, 1943, Oswald and Hess Company filed its complaint in this court. On November 1, 1943, complainant applied for leave to introduce additional evidence directed to showing the inadequacy of the relief afforded by the revised regulation in conjunction with the subsidy program established pursuant to the Directive of the Economic Stabilization Director issued October 26, 1943 (8 F.R. 14641). We granted this application by order entered November 3, 1943, in which we directed that the additional evidence be presented to the Price Administrator, together with such other evidence as the Administrator might deem it proper to receive. Accordingly the Administrator, on November 23, 1943, reopened the protest proceedings for the reception of additional evidence, and thereafter the protest proceeding was focused on the issue of the validity of RMPR 169.

On July 6, 1944, the Administrator issued an order, with accompanying opinion, denying the protest upon reconsideration.

For the most part, complainant's attack upon RMPR No. 169 must be rejected on the authority of Armour & Co. v. Bowles, No. 101, Em.App., 148 F.2d 529. We there upheld the Administrator's contention that the "cut-out test" method of accounting, as used generally in the industry, is not an acceptable criterion for determining whether the regulation establishes generally fair and equitable maxi

544

mum prices for beef carcasses and wholesale cuts. It may be noted that the Administrator's position in this respect is more or less borne out by an allegation in Oswald and Hess Company's protest that "it has always been necessary for the protestant to sell its fresh beef at a loss, which loss was always recovered by the sale of sausage products to its customers."

■ There remains, however, one objection to the regulation, upon which complainant's counsel put particular emphasis at the oral argument, and which was not pressed in the Armour case. This objection relates to the alleged discriminatory provisions of the regulation giving a premium to hotel supply houses in the sale of fabricated cuts to purveyors of meals. There are approximately 600 business establishments, generally known as hotel supply houses, whose chief function is that of preparing and fabricating meat cuts and selling them to hotels, restaurants, and other purveyors of meals. Some meat packing companies also perform this function as a minor part of their operations, either directly at their plants or branch houses or through subsidiary companies.

RMPR 169, as originally issued, allowed to hotel supply houses an average 20% mark-up over applicable zone prices on sales of fabricated cuts for use by hotels and other purveyors of meals. The mark-up was designed to preserve the historical price premium enjoyed by a particular class of sellers. As explained by the Administrator in his Statement of Considerations involved in the issuance of RMPR 169: "Hotel and restaurant supply houses have come into existence in the distribution of meat to perform certain services for purveyors of meals who lacked the facilities for performing such services for themselves. These services in the past have been primarily the selection, aging, boning and fabrication of primal cuts into roasts, steaks, stews, etc., and otherwise preparing the meat ready for cooking. The hotel supply houses are a necessary element in the distribution of meat and special provisions have been made in the Revised Regulation to permit them to continue these services." The Administrator declared his intention to establish specific and uniform prices on fabricated cuts as soon as sufficient data could be obtained on types and yields. Each hotel supply house was required by the regulation to submit its ceiling price for each fabricated cut, describing the cut, and showing the cutting yields obtained. Customary spreads between cuts were required to be maintained, and the ceiling prices, spreads, and yields were subject to review by the Office of Price Administration.

Amendment No. 12 to RMPR 169, issued May 26, 1943 (8 F.R. 7109), made a number of changes in the hotel supply house provisions in the light of experience under the regulation. In his Statement of Considerations accompanying the issuance of Amendment No. 12, the Administrator stated:

"It was apparent that the mark-up of 20% allowed made sales of fabricated cuts to hotels and restaurants more attractive than sales through other outlets, even after allowing for the additional costs of hotel supply house operations. Sellers sought to move the maximum quantity through hotel supply channels, thus magnifying the shortage in retail stores and putting retailers under pressure to evade the regulation by buying from hotel supply departments in order to obtain product. Because of the shortage and the fact that they possessed the meat, slaughterers were in a strategic position to take over a large proportion of the hotel supply business. Furthermore, the fact that some of the specialized services formerly offered by hotel supply houses were no longer necessary to obtain orders from hotels and restaurants, because of the shortage of meat, favored expansion by packers in the field. The higher realizations obtained from the sales of fabricated cuts under the mark-up permitted contributed to the strength in prices for live cattle which placed under hardship those establishments not selling to purveyors of meals."

In Amendment No. 12, the Administrator has listed and precisely defined a limited number of standard fabricated beef and meat cuts and has undertaken to determine the fair percentages of mark-up over the prices of wholesale cuts to cover costs of fabrication, operating expenses, and a fair net margin (a) for hotel supply houses, as defined, and (b) for packers, packers' branch houses, wholesalers, or other distributors. Specific ceiling prices are imposed in each zone for each grade of each fabricated cut, after allowing for the percentage of mark-up for each of the foregoing two types of sellers. The mark-up used in calculating specific ceiling prices for hotel supply houses was somewhat less than the 20% mark-up previously permitted in RMPR No. 169, which the Adminis-

trator had found to be too liberal. Slaughterers and packers' branch houses, who do not qualify as hotel supply houses, as defined, are allowed a lower percentage of mark-up on fabricated cuts than that allowed hotel supply houses. As the Administrator explained in the Statement of Considerations, this differential tends to maintain the relationship that existed in the past between prices obtained by the two types of sellers and to preserve their competitive positions. "It recognizes that the packer has obtained part of his profit in the price of the primal cut and that the diversified operations of the packer help to carry his overhead. In addition, the services rendered by packers to purveyors of meals have usually been less complete, thus making their costs in supplying this trade somewhat lower than the costs of the unaffiliated hotel supply companies."

Under § 1364.455(b), as added by Amendment No. 12, hotel supply houses are defined as establishments which, in the three months ended December 15, 1942, sold or delivered to purveyors of meals at least 70% of the total weight volume of all meats sold through such establishment. To qualify as a hotel supply house under the definition, a packing or slaughtering plant, packer's branch house, or wholesaler's or other type of establishment, must have maintained a separate selling unit not physically attached to the slaughtering plant, branch house, or wholesaler's or other establishment through which at least 70% of the total weight volume of meat distributed in the base period was sold or delivered to purveyors of meals. In addition, certain quota limitations are prescribed in § 1364.-415(a) under which each seller is prohibited from selling in the form of fabricated cuts in any quarterly period ending August 31, November 30, February 28, and May 31, more than 70%[1] of the total weight volume of all meats that he sold to purveyors of meals in the three months ended December 15, 1942. In his opinion denying complainant's protest upon reconsideration, the Administrator justifies these provisions as follows:

"On the other hand the Administrator recognized that preservation of the historical price premium enjoyed by the particular class of sellers known as hotel supply houses involved considerable difficulties, it was obviously necessary to prevent sellers from taking undue advantage of that premium and diverting supplies needed in a short market from the customary channels of distribution to the hotel and restaurant trade. Therefore eligibility for the premium was restricted to those who during a specified base period predominantly engaged in that trade and in addition a limitation of the amount of fabricated meat cuts which may be sold to purveyors of meals was established in the form of a quota determined by the amount of such sales made during such base period."

Complainant objected that the hotel supply house provisions made it impossible for it to purchase choice cattle in competition with slaughterers who have hotel and restaurant departments because the latter group can pay top prices and immediately convert the choice beef into fabricated cuts for their hotel and restaurant trade. "By doing so they receive under the regulation enormous prices for the cuts which are not justified by the amount of processing necessary to convert them." But complainant admits that a fair price differential for the sale of fabricated cuts "is absolutely necessary", because the types of cuts sold by hotel and restaurant supply houses "require additional processing and have other costs which justify a higher price". It alleges generally, however, that the premiums allowed are excessive. The Administrator found that this was so under the original provisions of RMPR 169, and by Amendment No. 12 made the revisions downward which we have summarized above. Complainant has offered no evidence to prove what the margin should be, and has failed to show that the differentials as established by the amended regulation are excessive or that it has actually suffered any substantial hardship from the operation of the amended hotel supply house provisions.

Furthermore, complainant insists that the regulation is discriminatory against the group of slaughterers who, like complainant, had no hotel and restaurant department during the base period and who, therefore, under the provisions of the regulation, cannot now enter the business of selling fabricated cuts to purveyors of meals. It appears to us that the Administrator had a rational basis for imposing the

---

[1] 90% by a later amendment.

546

restrictions objected to, and that we could not as a reviewing court find them to be arbitrary or capricious. However, we make no ruling on the point because, in our opinion, we have no jurisdiction to pass upon this particular objection. Even if the "grandfather clause" were struck out of the definition of hotel supply houses in § 1364.455(b), complainant would still be forbidden to sell fabricated cuts to purveyors of meals by force of the quota restrictions in § 1364.415, which was promulgated by the Administrator pursuant to delegated authority derived from the Second War Powers Act, 50 U.S.C.A.Appendix § 631 et seq., and not under the authority conferred upon the Administrator by the Emergency Price Control Act.[2] The jurisdiction of this court is limited to review of regulations or orders issued under § 2 of the Emergency Price Control Act, 56 Stat. 31, 50 U.S.C.A.Appendix § 902.

We have considered other objections by complainant to minor details of the hotel supply house provisions, and find them to be without merit.

Judgment will be entered dismissing the complaint.

---

[2] Subsection (d) of § 1364.415 expressly recites (8 F. R. 7109): "(d) This section is issued under the authority vested in the Administrator by Executive Order No. 9125, issued by the President on April 3, 1942; Directive No. 1 and Supplementary Directive No. 1-M of the War Production Board, issued on January 24, 1942 and September 12, 1942 respectively; Executive Order No. 9280, issued by the President on December 5, 1942; and Food Directives No. 1, No. 3, No. 5, No. 6 and No. 7 issued by the Secretary of Agriculture."