**F. URI & CO. v. BOWLES,**
**Price Administrator.**

**No. 11027.**

Circuit Court of Appeals, Ninth Circuit.
Dec. 18, 1945.
Rehearing Denied Feb. 15, 1946.

Edmund F. Maher, of San Francisco, Cal., for appellant.

George Moncharsh, Deputy Adm'r, for Enforcement, OPA., Fleming James, Jr., Director, Lit. Div., David London, Chief Appellate Branch, and Albert M. Dreyer, Sp. Appellate Atty., OPA., all of Washington, D. C., Herbert H. Bent, Regional Litigation Atty., and W. H. Brunner, Dist. Enforcement Atty., OPA., both of San Francisco, Cal., for appellee.

Before GARRECHT, MATHEWS, and BONE, Circuit Judges.

BONE, Circuit Judge.

This is an appeal from a judgment of the District Court in favor of the Price Administrator under Section 205(e) of the Emergency Price Control Act of 1942 as amended by Section 108(b) of the Stabilization Extension Act of 1944, 50 U.S. C.A.Appendix § 925(e).

The action involves two regulations issued under Section 2(a) of the Act, 50 U.S.C.A.Appendix § 902(a), namely Revised Maximum Price Regulation 169 (7 F.R. 10381), as amended by Amendment 12 (8 F.R. 7109), which became effective on June 1, 1943, and Revised Maximum Price Regulation 239 (7 F.R. 10688), as amended by Amendment 7 (8 F.R. 10444), which became effective on July 29, 1943. The former regulation established maximum prices for beef and veal; the latter for

lamb and mutton. Counsel for appellee, however, emphasized the claimed violation of Amendment 12 as the important element in this case. Each of the regulations, as modified by the amendments noted, prescribe schedules of maximum charges for "fabricated meat cuts" sold to hotels, restaurants and other purveyors of meals and defines the term "hotel supply house" in identical language.

The sole question presented on this appeal is whether or not appellants are a "hotel supply house," a status they concededly enjoyed prior to the claimed infractions of the O.P.A. regulations. The regulations mentioned define a "hotel supply house" as follows:

" 'Hotel supply house' means a separate selling establishment which is not physically attached to a packing or slaughtering plant, packer's branch house, wholesaler's or other selling establishment; which is engaged in the fabrication of meat cuts and in the sale of fabricated meat cuts, variety meats and edible byproducts to purveyors of meals; and which during the period September 15 through December 15, 1942, sold to purveyors of meals, other than war procurement agencies, 70 percent of the total weight volume of meat, variety meats or edible byproducts sold by it."

With this definition as a basis therefor, it is the contention of appellee (and the lower court so held) that appellants forfeited their legal status as a hotel supply house because they sold meats to persons other than purveyors of meals [1] *after* the effective dates of the amendments mentioned. Imposing such a change of status resulted in depriving appellants of the right to charge the higher prices for meat products granted to those enjoying the status of a hotel supply house, and thereafter they could only lawfully charge purveyors of meals the same prices charged by packing or slaughtering plants. This new price thus imposed by the loss of status averages 2 cents per pound *less* than the prices which were actually obtained by appellants during the period when appellants are charged with violating price schedules. Sales which are claimed to have violated price regulations were made between August 1, 1943 and February 1, 1944. All such claimed illegal sales ceased on the latter date. This action was commenced on February 29, 1944.[2]

In view of the definite emphasis laid upon Amendment 12 by counsel for appellee in his argument before this court, we proceed to examine its applicable provisions. As indicated, Amendment 12 to R.M.P.R. 169 became effective on June 1, 1943, and therefore its terms were binding on appellants on August 3, 1943, the date of their first alleged infraction.

A qualification for the status of a hotel supply house (in the definition above quoted) is that *"it must be a separate selling establishment which is not physically attached to a packing or slaughtering plant, packer's branch house, wholesaler's or other selling establishment."* (The emphasis here supplied in italics follows the emphasis in appellee's brief.) Appellee contends that when appellants sold meat to persons other than purveyors of meals they ceased to meet this condition of the definition; that their establishment *was no longer a separate establishment not physically connected with a wholesaler's or other selling establishment.* In appellee's view of the law the sale to one other than a "purveyor of meals," was a sale that in legal effect (and under the definition quoted) had the effect of making appellants a "wholesaler". This, according to appellee, was a deliberate departure from the operational requirements imposed upon hotel supply houses.

So far as the record discloses, appellants' establishment was not "physically attached" to any of the other kind of establishments

---

[1] The finding of the lower court was that the illegal sales to those other than purveyors of meals, were made to butchers. The court also found that the violations were neither wilful nor the result of the failure of defendants to take practicable precautions against the occurrence of the violations. The lower court denied an injunction (without prejudice) against appellants, finding that there was no evidence indicating a likelihood of the practices complained of being resumed.

[2] (As stipulated by the parties) "3. That the maximum prices which defendant could have charged for such sales and deliveries as a 'hotel supply house' averaged 2 cents per pound higher than those which he could have charged as a wholesale seller other than a 'hotel supply house,' and therefore for the purpose of this action 2 cents per pound is to be considered the proper differential to be used in computing any overcharges which the Court may determine were made by defendant in making such sales and deliveries."

named in the definition. But appellee argues that *two operations* are physically merged *if* a hotel supply house sells to purveyors of meals *and* to retailers from the same place, and he asserts that Amendment 12, by its definition of a hotel supply house, forbids such a *merger of operations*. This contention necessarily rests upon the assumption that in selling to retailers appellants "merged" the functions or operations of a "wholesaler" with those of a "hotel supply house." Appellee concludes his brief with the statement that "appellants lost their status as a hotel supply house because * * * they permitted their establishment to become a wholesale establishment by making sales to retailers of meat." This, then, was "the merger of operations" against which appellee directs his arguments.

Appellee calls to our attention the administrative construction and interpretation given the language of Amendment 12, with particular emphasis on the departmental interpretation of the language defining the status of a hotel supply house. He urges us to reject the interpretation advanced by appellants for the reason that we are legally bound by the administrative interpretation of this language under the doctrine of Bowles v. Seminole Rock, etc., Co., 325 U.S. 410, 65 S.Ct. 1215, 1217. There the court held that we must look to the administrative construction of a regulation if the meaning of the words used is in doubt—and the administrative interpretation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."

But the problem here presented differs in a material aspect from the particular issue faced by the court in the Seminole case. A reading of that case indicates that there both the regulations *and* the "administrative construction" thereof, were issued by the Administrator *concurrently*. This is not the situation confronting us in this case. At the time of the alleged violation of the regulations (August 3, 1943) the administrative constructions relied on and strongly emphasized by appellee had not yet been promulgated by the Administrator. Appellants confronted *only* the regulations and the Statement of Considerations in the issuance of Amendment 12 (hereafter referred to); not the regulations *and* these later administrative constructions. They did not then have the subsequently issued administrative interpretations to guide them. That chart was to come from the Administrator at a later time.

When the case came to trial on August 25, 1944, these administrative "interpretations" were then current, and available, as an aid to the court, although, as pointed out, they were, so far as the date of the offense was concerned, retrospective in character. The later "administrative constructions" of Amendment 12 available to the court at trial time, were not available to or binding upon appellants on August 3, 1943, *since they did not then exist*. Up to that time, the Administrator had not seen fit to promulgate an administrative interpretation (or interpretations) setting forth for the trade a definition of the term "hotel supply house" which was clear and unequivocal and left no doubt as to how he intended to apply it in the enforcement of Amendment 12. He did this later and at a time when doubts (reasonable or otherwise) as to the proper meaning of the definition in Amendment 12, were apparently troubling the entire trade. That the Administrator was becoming keenly and increasingly aware that doubt of an impressive and disturbing character regarding the exact status of hotel supply houses really existed and should be dispelled, may well be inferred. (It is asserted in appellants' brief that all San Francisco hotel supply houses were sued by the Administrator the year after Amendment 12 was issued.)

In order to better understand the problems involved in this case it will be necessary to discuss briefly the regulations and interpretations pertaining to hotel supply houses which were issued prior to Amendment 12 and those immediately subsequent thereto.

Prior to the regulations of Amendment 12, appellants were by their "established practice" a hotel supply house as defined in identical regulations for the sale of beef and veal (7 F.R. 10392) and of lamb and mutton in 7 F.R. 10690. The latter reads

"(5) 'Hotel supply house' means a seller of lamb or mutton who, as *an established practice,* handles lamb and mutton for the purpose of boning, trimming, and cutting or otherwise fabricating such lamb and mutton for resale to hotels, restaurants, and other purveyors of meals." (Emphasis supplied.)

That is to say, any seller of such edible cuts who customarily sold to purveyors of

meals (as an established practice) could sell any amount to purveyors of meals and any amount of his output to other buyers. The regulation as to lamb and mutton accompanying this definition provided:

"Section 1364.172(b) Specifically, but not exclusively, the following practices are prohibited: * * *

· "(5) Selling or invoicing lamb or mutton by hotel supply houses to persons other than purveyors of meals at the prices allowed on sales to purveyors of meals."

This regulation has not been set aside.

Effective on June 1, 1943, as to beef and veal, and on July 29, 1943, as to mutton and lamb the numbers of such hotel supply houses were more narrowly limited in the identical regulations of Amendment 12 to Price Regulation 169 and Amendment 7 of Price Regulation 239, redefining the phrase hotel supply house.

The question here is whether these regulations required a hotel supply house to sell *all* its edible cuts and by-products to purveyors of meals. The conspicuous thing regarding the regulation's involved language is that it fails to say that the hotel supply house must sell "exclusively" to purveyors of meals, whereas if this was the intent of the draftsman it would be expected that the word "exclusively" should have been inserted in the regulation's provision.

In order to present a clearer picture of the case, the regulation in dispute is again set out, the words in brackets inserted in it being those of the Price Administrator's interpretation published at the same time the regulation was promulgated:

" 'Hotel Supply House' means *a separate selling establishment which* is not physically attached to a packing or slaughtering plant, packer's branch house, wholesaler's or other selling establishment; *which* is engaged in the fabrication of meat cuts and in the sale of fabricated meat cuts, variety meats and edible by-products to purveyors of meals; *and which* [separate selling unit] during the period September 15 through December 15, 1942, *sold* to purveyors of meals, other than war procurement agencies, *70 percent of the total weight volume of meat,* variety meats, or edible by-products sold by it." (Emphasis supplied.)

The final words "and which" in the regulation correspond to the first and second words "which" and can refer to nothing but the principal subject "a separate selling establishment." That is to say, the selling establishment is separate although 70 percent is sold to purveyors of meals.

That the Price Administrator so regarded the final words "and which" is apparent from his interpretative statement issued at the time of the promulgation of the regulation. This treats a "separate selling unit not physically attached" as one selling at least 70 percent of its edible cuts to purveyors of meals although at the same time selling to other buyers, and reads as follows:

"Hotel supply houses are defined as establishments which, in the three months ended December 15, 1942, sold or delivered to purveyors of meals at least 70 percent of the total weight volume of all meats sold through such establishment. To qualify as a hotel supply house, a packing or slaughtering plant, packer's branch house or wholesaler's, or other type of establishment, must have maintained *a separate selling unit not physically attached* to the slaughtering plant, branch house, or wholesaler's, or other establishment, through which at least 70 percent of the total weight volume of meat distributed in the base period was sold or delivered to purveyors of meals. * * *" (Emphasis supplied) See Oswald & Hess Co. v. Bowles, Em.App., 148 F.2d 543, 545.

Confirming this interpretation that a "separate selling unit" could sell a part of its edible cuts to retailers, the Price Administrator on August 6, 1943, in an interpretation of Amendment 1 to M.P.R. 398 (similar to the earlier and unrepealed 1364.172(b) above,) stated with regard to the edible meat by-products of the regulation creating the hotel supply house that

"The allowance given hotel supply houses is amended so as to limit the overcharge that may be charged to sales made to purveyors of meals. It *was not intended that retailers be charged the $2.00 per* hundredweight addition." (Emphasis supplied)

It is obvious that hotel supply houses would not be forbidden to charge to "retailers" the additional two dollars a hundredweight which they were permitted to charge to purveyors of meals if they were required to sell exclusively to the latter.

In accord with this right to sell to retailers, Amendment 12 in amended regula-

tion 1364.407(e) provided for a method of discounting for hotel supply houses of *both* their sales to purveyors of meals and other buyers as follows:

"Section 1364.407(e) is amended to read as follows:

"(e) (1) Every *separate selling establishment* making sales to purveyors of meals * * * shall keep for inspection by the Office of Price Administration for so long as the Emergency Price Control Act of 1942, as amended, is in effect, a complete and accurate record in schedule form for each calendar month commencing with January, 1943, with respect to beef, and June 1, 1943, with respect to veal *showing separately:* * * * (ii) the *total sales in pounds during the month* of each grade of beef carcass, beef wholesale cut, fabricated beef cut, beef offal item, and beef by-product (bones, fat, tallow, waste, etc.); veal carcass, veal wholesale cut, fabricated veal cut, veal offal item, and veal by-product (bones, fat, tallow, waste, etc.), showing separately the sales in pounds of each grade of each item made to purveyors of meals, * * * *and the sales in pounds made to other buyers; * * * *"* (Emphasis supplied)

Correspondingly, with reference to added charge for longer deliveries, R.M.P.R. 169 provides this could be charged by hotel supply houses for their deliveries to *retailers* distant more than 25 miles in Section 1364.454(5), as follows:

"For local delivery made from the place of business of a wholesaler or *hotel supply house* * * * *to the place of business of a seller at retail, purveyor of meals or commercial user* * * * *located more than 25 miles from such shipping point; the seller may add the cost of local delivery* * * * *."* (Emphasis supplied)

The Section was not changed by Amendment 12.

This right of hotel supply houses to sell to retailers and "other buyers" is in accord with the declared policy of the Price Administrator to divert to the "shortage in the retail stores" meat which the premium of two cents a pound would draw to the purveyors of meals. In the statement of May 26, 1943, accompanying Amendment 12, the Price Administrator stated

"Immediately after Revised Maximum Price Regulation No. 169 was issued, many packers either began or greatly increased operations in the hotel supply branch of the meat industry. *Numerous reports were received by the Office of Price Administration that hotels and restaurants had abundant supplies of beef while great scarcity prevailed in retail stores * * *.*

"It was apparent that the mark-up [prior to the 2 cents per pound of Amendment 12] of 20 per cent allowed made sales of fabricated cuts to hotels and restaurants more attractive than sales through other outlets, even after allowing for the additional costs of hotel supply house operations. *Sellers sought to move the maximum quantity through hotel supply channels,* thus magnifying *the shortage in retail stores* and putting retailers under pressure to evade the regulation by buying from hotel supply departments [at 20 per cent mark-up] in order to obtain product * * *.*" (Emphasis supplied)

Confirming that it was the intent to divert the meat to a "short market" for retailers, the Price Administrator, over a year later on July 6, 1944, described what was intended by Amendment 12 of May 26, 1943, as follows:

"On the other hand the Administrator recognized that preservation of the historical price premium enjoyed by the particular class of sellers known as hotel supply houses involved considerable difficulties, *it was obviously necessary to prevent sellers from taking undue advantage of that premium and diverting supplies needed in a short market from the customary channels of distribution to the hotel and restaurant trade. Therefore eligibility for the premium was restricted to those who during a specified base period predominantly engaged in that trade* and in addition a limitation of the amount of fabricated meat cuts which may be sold to purveyors of meals was established in the form of a quota determined by the amount of such sales made during such base period." (Emphasis supplied) Statement of Administrator in dismissing appeal of Oswald and Hess Co. quoted in Oswald & Hess Co. v. Bowles, Em.App., 148 F.2d at page 545.

It is not surprising that all of the San Francisco hotel supply houses thought that they were within the spirit as well as the letter of the law, when instead of selling all their meats at the premium of sales to purveyors of meals, they denied themselves some of that profit and sold some of them

to their old retail customers suffering from the "shortages in the retail stores" which the Administrator May 26, 1943 stated he desired to aid.[3]

The result of the re-definition as interpreted by the Price Administrator is that the hotel supply house is just what it was under the definition prior to Amendment 12, if during the base period it had a separate selling unit not physically attached in which it sold 70 per cent of its cuts to suppliers of meals.

■ Such interpretations rationally conceived and which are issued at the time of the regulation, determine the meaning of the words of the statute. Bowles v. Seminole Rock, etc., Co., supra.

There is another factor which is persuasive in forming our conclusion. As we have stated, one of the objects of Amendment 12 to R.M.P.R. 169 was to divert the supply of meat back into the customary channels of distribution so that retail butchers would obtain a fair share. Therefore Amendment 12 set up specified quarterly periods and prohibited sellers to sell during each quarter more than 70 percent of the total weight volume of all meats that they sold to purveyors of meals in the three months ending December 15, 1942. (War procurement agencies were excluded from these determinations.) This part of the Amendment appears to be an effort on the part of the Administrator to restrict sales to purveyors of meals and open the sales channels to retailers. However, if the Administrator's interpretation of "hotel supply house" be followed such an establishment could not sell its excess over 70 percent of its base period sales to retailers for it must sell to purveyors of meals alone. Therefore a hotel supply house like that of appellants' which normally sold a minor part of its meats to retailers is prevented from doing so, and, moreover, its business is restricted to 70 percent of its volume for the base period in 1942.

■■ With these interpretations of the two regulations it is apparent from the above agreed facts that appellants acquired as of June 1, 1943, as to beef and veal and as of July 29, 1943, as to lamb and mutton, the status of a hotel supply house. They continued to hold that status through the period of sales of edible cuts considered in this litigation, that is from August 1, 1943, to February 1, 1944, unless appellants were deprived of the status by the following interpretative statement of the Price Administrator of October 20, 1943:

" 'Hotel Supply House' In *order to RETAIN its status* a hotel supply house must sell meat products *only* to purveyors of meals. If a hotel supply house sells a carcass, wholesale cut, fabricated cut, sausage, variety meats or edible by-products *to a retailer* it loses its status as a hotel supply house, as defined in Section 1364.455(b)(1). This interpretation applies also to Regulations No. 398 (Edible By-Products at Wholesale) 389 (Ceiling prices for certain sausage items at Wholesale) and 239 (Lamb and Mutton Carcasses and Cuts at Wholesale and Retail.)" (Emphasis supplied) Price Interpretation 29.

This interpretation for the first time brings from the Price Administrator the idea that the sales must be made exclusively to purveyors of meals. It recognizes its novelty by the use of the phrase "in order to *retain its status*". The Price Administrator is empowered to alter a status created by a prior regulation only by an order or another regulation. 50 U.S.C.A. Appendix § 902. Price Interpretation No. 29 of October 20, 1943, is neither. If the attempted interpretation of October 20 be regarded as a true interpretation of Amendment 12 it would have to relate back to May 26, 1943.

The gross injustice of such a later contradictory interpretation to merchants relying upon the Price Administrator's interpretation of May 26, given at the time of the promulgation of Amendment 12, is equally obvious. It makes the Price Administrator say, in effect, that on May 26 these business concerns acquired a certain status by virtue of his interpretation, but on October 20, by a different interpretation they did not then acquire it. We cannot so construe the October 20 interpreta-

---

[3] The appellee claims that one of the reasons why hotel supply houses were allowed a mark-up was because of the greater cost of their services and that if they were allowed to sell even a minor percentage of their meat cuts at wholesale then they would be able to spread overhead costs as could the large packers, wholesalers, et cetera. However, the able trial judge found that all appellants' sales to butchers "were made at [appellants'] costs without any mark-up or profit whatsoever."

tion but regard it as an attempt to change at that later date the established status of May 26, 1943. The Price Administrator's attempt failed because he can make such a change only by order or regulation.

It is sufficient to say of the contention of counsel for appellee that they rely on statements of the Administrator made after and to support the interpretation of October 20, 1943. Nowhere is there even mentioned, much less considered, the Price Administrator's definition of May 26, 1943, of a "separate selling unit not physically attached" as one in which 30 per cent of edible cuts may be sold to others than purveyors of meals; nor the statement of May 26, 1943 and of July 6, 1944 that added sales to retailers was a desired end in creating the hotel supply houses; or, that of August 6, 1943 that hotel supply houses should not charge the two cents per pound premium sales to retailers.

The judgment of the lower court is reversed.