## PORTER, Price Administrator, v. TANKAR GAS, Inc.

### Civil Action No. 1149.

District Court, D. Minnesota, Fourth Division.

Sept. 6, 1946.

Amos J. Coffman, Regional Atty., George E. Leonard, Regional Litigation Atty., Isadore L. Kovitz, Sp. Trial Atty., and Jacob Cohen, Regional Enforcement Atty., all of Chicago, Ill., for plaintiff.

Brill, Maslon, Grossman & Brill, of Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

To obtain an understanding of the specific question presented, it would seem that a somewhat detailed recital of the history of the proceedings is necessary. This action was commenced in June, 1944. The complaint alleged that between June 26, 1943, and April 28, 1944, at various places in the middle section of the United States, including Minnesota, from its bulk distributing plants located therein, defendant sold 1,196,887 gallons of "stove and light gas" in excess of the ceiling price established by Maximum Price Regulation 88, as amended. It was alleged that the over-ceiling price extracted by the defendant totaled some $60,000, and treble damages in the sum of $180,000 were sought. Maximum Price Regulation 88 in general covers petroleum and petroleum products, including industrial naphtha and solvents derived from petroleum. After receiving a bill of particulars from the plaintiff which set forth the sales allegedly made at over-ceiling prices, defendant's counsel wrote the District Enforcement Attorney of the Office of Price Administration as to which cate-

gory or categories of the definition of petroleum products contained in Maximum Price Regulation 88 the product covered by the bill of particulars fell within. Apparently, this inquiry was prompted by the fact that the complaint referred to the product as "stove and light gas," and such descriptive words used with reference to any petroleum product were not to be found in the regulations. In response to the letter, the Enforcement Attorney replied on August 30, 1944, in part:

"* * * you query as to what category or categories of the definition of petroleum products contained in Maximum Price Regulation No. 88 do the products covered by the Schedule which we furnished you fall within. Please be advised that it is our contention that the commodity sold by Tankar Gas, Inc., was in fact a grade of gasoline and as such is covered in the Regulations under Article 1, Section 1.1, entitled 'To What Products This Regulation is Applicable,' covering all grades of gasoline including natural gasoline and blending naphtha."

After receiving this letter, the defendant assumed that the plaintiff intended to establish at the trial of the case that the product sold by it was in fact a gasoline, and hence covered by the regulation governing natural gasoline and blending naphtha. But it insisted that the naphtha product sold by it was not a gasoline or covered by the regulation covering gasoline and blending naphtha, but, on the contrary, the naphtha sold as stove and light naphtha, or stove and light gas, was in fact a general utility naphtha, and hence, if covered by any regulation, came under the category of an industrial naphtha or solvent derived from petroleum, which product was likewise covered by Maximum Price Regulation 88.

Thereafter, in January, 1946, plaintiff petitioned this Court for leave to amend his complaint, leaving the original complaint as stated, but adding Count Two which alleged that the sales under Count One were sales of an industrial naphtha and solvent product, and that Revised Price Schedule 88 and Maximum Price Regulations 88 and 510 included provisions for the determination of maximum prices for such petroleum product and further provided that, if a seller was unable to determine a maximum price for any product subject to said regulations, the seller might determine his maximum price in the manner provided therein and then file the same for approval with the Petroleum Branch of the Office of Price Administration in Washington, D. C. The proposed Count Two then alleged that defendant not only was unable to determine the maximum price in the manner provided in the applicable sections of the regulation covering industrial naphtha and solvents derived from petroleum, but had failed to file its maximum selling price for approval with the Office of Price Administration. Plaintiff therefore sought under Count Two a mandatory injunction compelling defendant to apply for a ceiling price, and under Count Three of the amended complaint plaintiff sought treble damages by virtue of the Administrator's anticipated ceiling price established under Count Two and which plaintiff apparently assumed would be lower than the price at which the product was sold by the defendant, and hence permit the recovery of treble damages on the excess. While Count One as originally framed, and as retained, was broad enough to include within its allegations petroleum products other than gasoline, in that the alleged violation was stated in general terms as coming within the purview of Maximum Price Regulation 88, it was apparently recognized by all parties, and so understood by the Court when the application for the amendment to the complaint was submitted, that the plaintiff would contend that the product sold, if not a type of gasoline, came within the category of industrial naphtha or solvents derived from petroleum. Plaintiff recognized, of course, that he was pleading two inconsistent causes of action, but under the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, such pleading is permitted. In considering the requested amendment, this Court did not purport to pass finally on the right of the Administrator to promulgate a ceiling price retroactively, but on April 12, 1946, did allow the amendment as plaintiff requested. However, when the matter was called for trial on June 4, 1946, there had been a

change of attorneys representing plaintiff, and the attorneys who then represented him took the position for the first time that the product sold by the defendant during the period of alleged price violation was not a gasoline or blending naphtha and was not an industrial naphtha or a solvent derived from petroleum, but was a "distillate burning, heating or fuel oil" within the regulations involved, stating that "the category of petroleum products, which includes stove and light naphtha, is specifically spelled out in the regulation under the nomenclature of 'distillate burning, heating or fuel oil.'" Not only did plaintiff limit the case to the portion of the regulation covering distillate burning, heating or fuel oil, but he voluntarily dismissed Counts Two and Three of the amended complaint and relied exclusively on the contention that the stove and light naphtha sold by defendant falls under the designation of a distillate fuel oil.

Moreover, it may be pointed out that on February 20, 1945, plaintiff brought in a separate proceeding an injunction suit against this defendant, claiming that the naphtha product sold by defendant since November, 1944, as unrationed naphtha (which is the same product referred to herein as stove and light naphtha) was not sold by defendant in March, 1942, and that, therefore, the maximum price could not be determined by the applicable regulations, making it necessary for defendant to apply to the Office of Price Administration for the approval of a maximum price. The action sought a mandatory injunction requiring defendant to apply to the Office of Price Administration for the approval of a maximum price and restraining it from any further sales pending such application. However, the motion for temporary injunction as requested was denied on April 6, 1945, and the suit has not progressed further.

From all the circumstances herein, it seems that the parties recognize that the naphtha labeled "stove and light" naphtha, which was sold by defendant as such during the period of alleged violation, and that sold since November, 1944, was not being used by the purchasers primarily for use in pressure appliances and probably but a small amount was used for general utility purposes, such as cleaning and as a solvent. In that the Office of Price Administration had not rationed this grade of naphtha, the large bulk of the product was used by the purchasers as a motor fuel regardless of the apparent deleterious effect on motors when such product was used as a fuel. Defendant apparently sought to free itself of any charge of wrongdoing by selling the product only in cans and requiring the service stations which handled it to obtain written assurance from the purchasers that this unrationed naphtha would not be used for motor fuel. But the unprecedented sales of naphtha during the period of the violations and thereafter would seem to permit no other explanation but that the bulk of the product was being diverted into fuel for automobiles. The naphtha which the Office of Price Administration rationed after November, 1944, was limited by the terms of the rationing order to naphtha which had an ASTM 10% distillation point below 220 degrees Fahrenheit. The unrationed naphtha sold by the defendant had a 10% distillation above 220 degrees Fahrenheit and therefore, according to the interpretation of the Office of Price Administration, ration stamps were not necessary upon the transfer of this product. For some reason, not apparent in the evidence, the Office of Price Administration did not seek to ration this so-called unrationed naphtha during the entire period with which we are concerned.

It was on February 20, 1945, the same day that suit was instituted to compel defendant to apply to the Office of Price Administration for approval of a maximum price on the sale of unrationed naphtha sold as stove and light naphtha, and months after the present suit was instituted, that the Administrator first issued the statement that stove and light naphtha was in fact included—and had theretofore been so considered—in the category of distilled fuel oils and hence subject to the price ceiling applicable to that category, which would be the maximum ceiling price established by reference to the price charged by Standard Oil Company of Indiana for stove and light naphtha as of October 1, 1941. If stove and light naphtha is not included within the category of distillate fuel oils,

then the ceiling price would be defendant's selling or offering price in March, 1942, whether under the maximum price regulations as industrial naphtha or solvents derived from petroleum, or whether the ceiling price is merely determined generally under the general maximum price regulations. We have the situation, therefore, that if the product sold by defendant is embraced within the category designated as distillate fuel oils, the ceiling price has apparently been violated. But if the March, 1942, selling or offering price of defendant controls, and not the Standard Oil Company's price as of October 1, 1941, which March price would be the ceiling price criterion if plaintiff has not established that the product comes within the category of fuel oils, then plaintiff has failed to establish that defendant's selling price during the period of the violations exceeded the applicable ceiling price.

Revised Price Schedule 88, as amended by Amendment 95, effective May 13, 1943, described the petroleum products covered by the regulation in Section 1340.157(b) as follows:

" 'Petroleum products' means:

"Liquefied petroleum gases.

"All grades of gasoline, including natural gasoline and blending naphthas; also special hydrocarbon fractions utilized in the manufacture of gasoline or the components thereof.

"Industrial naphthas and solvents derived from petroleum.

"Petroleum fractions when sold as antifreeze preparations.

"Tractor distillates and similar distillate type motor fuels other than gasoline.

"Kerosene, including range oil or stove oil.

"Distillate burning, heating or fuel oils.

"Diesel fuel oils.

"Lubricating oils, including motor, aviation and stock oils (neutrals, bright stocks, steam refined stock and other stock oils) and all greases and industrial lubricating oils except core oils and core washing oils.

"Mineral oil polymers.

"Petroleum sulphonates.

"Residual burning, heating or fuel oils."

This regulation remained the same until February 19, 1944, when Revised Price Schedule 88 was reissued and designated as Maximum Price Regulation 88. Section 1.1 of Maximum Price Regulation 88 described the petroleum products covered by this regulation and supplanted Section 1340.157(b). The coverage, however, of distillate fuel oil remained the same under both of these regulations and also under Maximum Price Regulation 510 during the entire period covered by this proceeding.

As heretofore stated, plaintiff predicates his claim for recovery on the sole contention that the provision of the regulations above quoted reading "distillate burning, heating or fuel oils" includes the stove and light naphtha sold by the defendant, and obviously, unless he has sustained the burden of proof in that regard (Bowles v. Leventhal, D.C.S.D.N.Y., 61 F.Supp. 144), he has failed to make out a case. A consideration of the evidence would seem to impel the conclusion that plaintiff has failed to sustain the burden resting upon him in that regard. First, it may be stated that there is no persuasive evidence from any of plaintiff's witnesses that, according to trade meaning and usage or understanding, or by way of any reasonable interpretation, stove and light naphtha fairly comes within the purview of a distillate burning, heating or fuel oil as used in the regulations. Concededly, there is much similarity in all petroleum products, but, in light of the detailed classification used by the Administrator in the price regulations and elsewhere, it is evident that the various petroleum products sought to be covered were set forth in considerable particularity. Naphtha, as well as gasoline, kerosene, benzine, and other petroleum products, is obtained from petroleum by fractional distillation, but that does not warrant the assumption that all distilled by-products of petroleum which may be used in some manner for certain types of burning or heating come within the category of distillate fuel oils. There is evidence offered by the plaintiff to the effect that stove and light naphtha is not an industrial naphtha, and that generally it is sold and distributed for use in pressure appliances, gasoline lamps, gasoline blow torches, and equipment which

burns a volatile fuel in distinction of a type of fuel such as a kerosene range oil type of distillate fuel. But it would seem that the mere fact that stove and light naphtha may be used as fuel in pressure appliances does not warrant a finding that the product is a distillate fuel as that term is used within the purview of the regulations. Many petroleum products may be used for fuels. For instance, gasoline and kerosene are frequently used for heating and lighting purposes, but it is not contended that such products would be properly classed under the category of a distillate heating fuel, and moreover, it is not denied that the stove and light naphtha sold by the defendant had many other uses besides its use in pressure appliances, that is, prior to gas rationing, at least, it was used by consumers for general cleaning purposes, such as cleaning machinery parts, washing blower pipes, cleaning garments and cement drives, as well as a solvent to aid in removing grease and tar spots from automobiles, etc. And if it is urged that the Administrator intended to include all petroleum products in promulgating this particular regulation, it is much more reasonable to assume that he intended to include stove and light naphtha under the general term "industrial naphthas and solvents derived from petroleum" than under the category which he now advances. Everyone must recognize that stove and light naphtha is a solvent derived from petroleum and can have many uses as a solvent. It is plaintiff's position, however, that only naphthas which go into industrial trade in large quantities for use by paint and varnish manufacturers, etc., are properly classified as industrial naphthas. Plaintiff's witnesses stress the end use rather than the specifications of the product. No doubt, if naphtha having substantially the same specifications as stove and light naphtha was sold to the industry in large quantities, it would, under plaintiff's definition, be properly designated as an industrial naphtha. But, in view of the fact that the stove and light naphtha was sold in small quantities in service stations, it is contended that it is not properly designated as an industrial naphtha. If end use is the determining factor, then clearly, the naphtha sold by defendant is not a fuel oil. Moreover, none of plaintiff's witnesses has stated that stove and light naphtha is fairly embraced within the term "distillate fuel oils" as the latter term is commonly used and understood by the trade.

Plaintiff asserts, however, that the burden of proof resting upon him has been fulfilled by reason of Amendment 25 to Maximum Price Regulation 88, issued February 20, 1945, the Statement of Considerations issued therewith, and amendment to the Statement of Considerations issued December 5, 1945. In Amendment 25, issued February 20, 1945, the then Price Administrator, Chester Bowles, introduced for the first time his designation of "stove and light naphtha" as one of the products covered by the regulation. In the Statement of Considerations issued therewith is found the following: "It may be noted that stove and light naphthas are specifically mentioned, which is not to be considered as a change, except in form, since such products were heretofore considered to be covered as distillate burning or heating fuel oils." In the Statement of Considerations under Amendment 27 to Maximum Price Regulation 88, issued June 8, 1945, in referring to the inclusion of stove and light naphtha among the products covered, it is stated: "This change is to be regarded as merely a clarification, since stove and lamp naphtha was heretofore considered to have been included in the section under the general designation of distillate fuel oil." In Amendment 25 to Maximum Price Regulation 88, issued December 5, 1945, which expanded the Statement of Considerations with reference to the inclusion of stove and light naphtha, appears the following:

"Section 1.1 which lists the products to which the regulation is applicable has been rewritten to set forth more clearly the products actually covered. It may be noted that stove and lamp naphtha is specifically mentioned, which is not to be considered as a change, except in form. Certain products which have the characteristics of gasoline and are the same as or similar to products sold in other parts of the country under the name of 'gasoline' or 'white gasoline,' have always been sold in the Midwestern area under the designation of

108

'stove and light naphtha' or 'stove and lamp naphtha' or 'stove and light gasoline.' Thus, by reason of the characteristics of these products they can be classified as gasoline. Furthermore, in view of the end use of such products as a fuel, they are also included in the classification of distillate burning, heating, or fuel oils. Stove and lamp naphthas and similar products are generally used to create heat or light in pressure appliance apparatus, whereas certain other distillate burning, heating, or fuel oils are used to create heat and light by a different process."

The alleged violations set forth in the complaint cover a period from June, 1943, to April, 1944. The complaint was filed June 10, 1944, and service was made upon the defendant on June 12, 1944. It appears, therefore, that the product sold by the defendant was not specifically covered by the regulations during the alleged period of violations, and the product by name first appeared in the regulations some eight months after this suit was commenced. Moreover, the Statement of Considerations in which the Administrator claimed that stove and light naphtha was embraced within the term "heating fuels" was issued almost ten months after the last date of the alleged violation herein. There is an utter absence of any expression by the plaintiff or plaintiff's predecessors in the various price schedules or in the statements issued in explanation thereof prior to February 20, 1945, which indicates that anyone assumed that stove and light naphtha came under the category of a distillate fuel oil. Administrators Henderson and Brown issued all the various price regulations between February 2, 1942, and August 26, 1943. Chester Bowles, who was the Administrator when this action was brought, did not frame the original regulations covering petroleum products, but he assumed to state long after this suit was commenced what was intended by the regulations promulgated by his predecessors. It would seem that the belated statement as to the category in which stove and light naphtha should be placed is not only strikingly inconsistent with the other acts of the Administrator in carrying out the rationing regulations issued by his office, but is also contrary to the unquestioned weight of the evidence in this proceeding. As indicative of the views entertained by the Office of Price Administration regarding the category designated as distillate fuel oils, it may be pointed out that stove and light naphtha coming within certain specifications first became rationed on November 20, 1944, under the provisions of Ration Order No. 5(c) covering motor fuel. This ration order was undoubtedly promulgated to prevent naphtha within these certain specifications from being diverted into channels for use as motor fuel instead of gasoline. But while this type of stove and light naphtha was not rationed until November 20, 1944, the rationing of fuel oil began as early as October, 1942, by Ration Order No. 11, and in "Questions and Answers" issued by the Office of Price Administration on October 11, 1942, there will be noted the following:

"Q. What types of fuel oil are being rationed? A. All grades of distillate and residual fuel oils, kerosene and diesel fuel."

In Section 1394.5001(a) (15) of Ration Order No. 11, the following provision appears:

" 'Fuel oil' means any liquid petroleum product except used lubricating oil, whether or not refined, commonly known as fuel oil, including grades Nos. 1, 2, 3, 4, 5 and 6, whether or not blended or rebranded, such as Bunker C Diesel oil, kerosene, range oil, and gas oil. The term also includes any other liquid petroleum product having the same specifications as the above designated grades and used for the same purposes as such grades."

Plaintiff attempts to negative any inconsistency in the administrative practice in not considering stove and light naphtha as being rationed under fuel oil by contending that, in using the term "fuel oil," the Administrator directed that term only to certain grades of fuel oil. But, in designating the grades, it is evident that the Administrator assumed to designate all the grades of fuel as that term was commonly understood. If the Office of Price Administration considered that all naphtha labeled as stove and light naphtha was a fuel oil

because it could be used in a certain limited way for the purpose of heating and burning in pressure appliances, no good reason is forthcoming why it is not embraced in the Administrator's rationing regulations covering fuel oil or some explanation made for its exception therefrom. Certainly, the trade would have every right to assume that, if stove and light naphtha was not considered a fuel oil within the rationing provisions, it should not be considered a fuel oil within the maximum price regulations.

But, in addition, the evidence seems persuasive that the product known as stove and light naphtha sold by the defendant within the period of the alleged violations does not come within the purview of the interpretation and understanding which is commonly and usually accorded to distillate fuel oils. It will be observed in this connection that the Administrator uses the term "distillate fuel oils" as embracing the provision of the regulations noted as "distillate burning, heating or fuel oils." Under the evidence herein, the distinction between stove and light naphtha and fuel oils seems obvious because of several indisputable factors. It may be pointed out that the specifications of the products are not similar; the initial and end boiling point of stove and light naphtha is substantially lower than the initial and end boiling point of distillate fuel oil. Stove and light naphtha cannot be used for heating purposes in oil burning furnaces or in a wick-fed heating or lighting apparatus because, by reason of its volatility, it would cause an explosion and be highly dangerous. The volatility of the products is vastly dissimiliar. Distillate fuel oil, as well as kerosene, might stand for weeks without volatilizing, but stove and light naphtha would volatilize and disappear in the area at room temperature in a comparatively brief period. Not only is it impossible to use stove and light naphtha in a fuel oil furnace or stove, but fuel oil could not be used in any pressure type of apparatus. In the refining process, stove and light naphtha, being a low boiling product of petroleum, is removed before distillate fuel oil. It appears without contradiction in the evidence that, in the trade, distillate fuel oil does not include within its classification stove and light naphtha. The only witness (a qualified expert in the petroleum industry) who testified at any length as to the difference between stove and light naphtha and distillate fuel oils was called by the defendant, and in answering the question as to what was understood by the term "distillate fuel oil" or "distillate burning oil," he stated:

"A distillate burning oil is an oil that is used in what we term—that is, our furnaces, for homes, and also for space heaters in homes. It is generally a material, slightly higher boiling point, flash point especially, than the ordinary kerosene. It may be a number 1 burning oil, it may be a number 2 burning oil, or it may be a number 3 oil. Number 3 oil is used in heating plants, in residences, and things of that kind. Number 2 oil is used in the so-called spindle type burners, like the ABC burner. The number 1 oils are in some places sold as range oil, and used for space heaters, where they have a stove inside of the room and heat two or three rooms from that; it is a gravity feed generally." (Tr., p. 341).

He also stated unequivocally that stove and light naphtha is not a distillate fuel oil. Moreover, he stated that stove and light naphtha may be used as an industrial naphtha with various uses as a solvent and in pressure appliances.

What, then, in light of the evidence, is the weight to be attributed to the Administrator's interpretation given some eight months after this suit was commenced? In Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, the Supreme Court laid down the broad rule that courts must look to the administrative construction if the meaning of the words used in the regulation is in doubt, and that the Administrator's interpretation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." But in this case the Supreme Court was considering an administrative interpretation issued concurrently with the regulation, not an interpretation which was issued after the alleged violation took place and after the litiga-

tion was commenced by the Administrator seeking to enforce the particular regulation. Neither the trade in general nor this defendant had the benefit of the administrative interpretation during the period of the alleged violations. It is not made to appear that the trade, in light of its long experience in dealing with petroleum products, has ever considered that stove and light naphtha was a distillate fuel oil, as that term is commonly used and understood. That confusion has existed in the Office of Price Administration as to which category of the regulation embraced stove and light naphtha is evident from the shifting position of those who instituted and carried on this lawsuit and the companion proceeding in behalf of the Administrator. If experienced counsel acting in his behalf flounder in their attempt to classify properly stove and light naphtha under the regulation, it would seem to be a gross injustice to bind the defendant herein to the bald assertion of the Administrator as to what his predecessors meant when the regulation was promulgated by them. If the Court is bereft of all authority to determine the correct interpretation of a regulation, in light of the evidence before him, then the Administrator in any pending lawsuit involving the interpretation of a regulation may, by belated edict, control its outcome. Surely, such an absurdity was never intended.

The Circuit Court of Appeals for the Ninth Circuit in F. Uri & Co. v. Bowles, 152 F.2d 713, 715, was confronted with the problem of construing the Seminole case in light of the factual situation in the proceeding before it. As here, the Administrator in that case relied upon an interpretation issued after the violation took place. The question was whether the appellants were a "hotel supply house" at the time of the violations as defined under the Maximum Price Regulation. In commenting upon the language of the Supreme Court in the Seminole case as to the weight to be attached to an administrative interpretation, the court stated (p. 715):

"But the problem here presented differs in a material aspect from the particular issue faced by the court in the Seminole case. A reading of that case indicates that there both the regulations *and* the 'administrative construction' thereof, were issued by the Administrator *concurrently*. This is not the situation confronting us in this case. At the time of the alleged violation of the regulations (August 3, 1943) the administrative constructions relied on and strongly emphasized by appellee had not yet been promulgated by the Administrator. Appellants confronted *only* the regulations and the Statement of Considerations in the issuance of Amendment 12 (hereafter referred to); not the regulations *and* these later administrative constructions. They did not then have the subsequently issued administrative interpretations to guide them. That chart was to come from the Administrator at a later time."

◼ Paraphrasing the language of the court in the Uri case, it may be stated that the defendant in this case had no chart to guide it during the entire period of the alleged violations with reference to the interpretation which the Administrator now seeks to impose. After this suit was commenced, it was informed that stove and light naphtha was in fact a gasoline and should be governed by the regulations covering gasoline. Later, it was intimated that, if the product was not covered by the gasoline regulations, it came within the purview of industrial naphtha or solvents derived from petroleum. Even as late as December 5, 1945, in Amendment 25, the Administrator advanced the contention that stove and light naphtha could be classified as a gasoline. But it is not made to appear why the Administrator has abandoned his claim that the naphtha product sold was in fact a gasoline under the regulations. The rule that administrative rulings or interpretations should be attributed controlling weight only when such rulings or interpretations are issued contemporaneously with the regulation which is being considered finds support in Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796; Lukens Steel Co. v. Perkins, 70 App.D.C. 354, 107 F.2d 627.

◼ But even applying the literal language of the Supreme Court in the Semi-

sole case where the interpretation was issued concurrently with the regulation, it would seem, under the evidence herein, that the Administrator's interpretation is plainly erroneous and inconsistent with the administrative practices under the regulation. Certainly as stated in Estate of Sanford v. Commissioner, 308 U.S. 39, 60 S.Ct. 51, 60, 84 L.Ed. 20, " * * * courts are not bound to accept the administrative construction of a statute regardless of consequences, even when disclosed in the form of rulings." The average businessman dealing in petroleum products during the period of the alleged violations, and prior to the administrative ruling herein, would never look to "distillate burning, heating or fuel oils" as the category which would establish the ceiling price on stove and light naphtha, particularly when stove and light naphtha was not rationed until November, 1944, and when all distillate fuel oils were rationed as early as October, 1942. No good reason is made to appear why the Administrator should be upheld in his attempt to bind the defendant to the questionable distillate fuel category when it is more reasonable to place the naphtha product under the category of industrial naphtha or solvents derived from petroleum, or even as a gasoline in view of its apparent end use. Obviously, the dubious ethics of defendant in selling unrationed naphtha to the public and labeling it stove and light naphtha, when it knew or should have known that it was being diverted for use as motor fuel, thus tending to circumvent the wartime curtailed use of motor vehicles, should not deny defendant fair consideration in determining whether in selling the product it has violated the maximum ceiling price regulations.

In view of the conclusions arrived at herein, it is not necessary to determine definitively whether stove and light naphtha comes under the category of industrial naphtha and solvents derived from petroleum, as that term is used in the regulations. Plaintiff has not offered any evidence as to the ceiling price of any product embraced in that category. He has not sought to establish any violation on the part of the defendant in that regard, either under the maximum price regulations or the general maximum price regulations. On the contrary, defendant has gone forward with proof which tends to establish that it sold and offered for sale a grade of naphtha in March, 1942, which was substantially the same product as the stove and light naphtha sold during the period of the alleged violations, although at that time it was simply called naphtha, and that the selling price of the stove and light naphtha within the period of the alleged violations was within its March, 1942, price. Therefore, if the product comes within the category of industrial naphtha or solvents derived from petroleum, or if the product sold is neither distillate fuel oil nor industrial naphtha, but is covered by the general maximum price regulations, then, according to defendant's showing, the selling price challenged herein is within the ceiling price as established by such regulations. But, the Court having found that the product sold by the defendant is not a distillate fuel oil within the meaning of the regulations, and in that the plaintiff relies entirely and exclusively on the maximum ceiling price by reference to the Standard Oil Company of Indiana's price as of October 1, 1941, which under the evidence is only applicable if defendant's product is a distillate fuel oil, it follows without more that plaintiff having failed to sustain the burden of proof which devolves upon him in this regard, judgment must be entered for the defendant.

Findings of fact and conclusions of law consistent herewith may be presented by the defendant.

An exception is reserved to the plaintiff.